IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA JONES, o/b/o K.H., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16 C 2340 |
| vs. ) | |
| ) | Magistrate Judge Schenkier |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Melissa Jones, on behalf of her minor son, K.H., has filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying K.H.'s ("KH") application for Supplemental Security Income Disability Benefits ("SSI") (doc. # 14). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (doc. # 15). For the following reasons, we grant Ms. Jones' motion and deny the Commissioner's motion.

I.

We begin with the procedural history of this case. Ms. Jones applied for SSI on her son's behalf on January 20, 2012, alleging KH became disabled on October 17, 2011 as a result of Attention Deficit Hyperactivity Disorder (ADHD) (R. 18, 75). The application was denied initially on June 5, 2012, and upon reconsideration on August 24, 2012 (R. 72, 79). Upon timely

---

[1]On March 23, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 11).

request, a hearing was held before an Administrative Law Judge ("ALJ") on March 20, 2014 (R. 57-68). The ALJ issued an unfavorable decision on June 3, 2014, finding that KH was not disabled (R. 18-35). The Appeals Council denied Ms. Jones' request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## II.

We proceed with a summary of the administrative record. Part A briefly sets forth KH's background, followed by his medical and school records. Part B discusses the testimony provided at the hearing before the ALJ, and Part C summarizes the ALJ's written opinion.

### A.

KH was born on June 14, 2005 and lives with his mother, maternal grandmother, and his older brother. KH's father was never married to his mother and does not live with them, but he sees KH regularly.

The earliest relevant medical or school record is a Report of Behavioral Checklist written by Donna Coleman Scotti, a Chicago Public School ("CPS") psychologist, on October 17, 2011, while KH was attending first grade (R. 206-207). The report was based on: a the results of a Behavior Assessment System for Children, Second Edition ("BASC-2") checklist completed by two of KH's classroom teachers and his mother; review of KH's school records; consultation with KH's classroom teacher; and classroom observation (R. 206). The school psychologist reported that a majority of raters assessed KH as "At-Risk and/or Clinically Significant" on the following Clinical and/or Adaptive Scales: hyperactivity; aggression; attention problems; learning problems; atypicality; withdrawal; social skills; leadership; and functional

communication (*Id.*). The school psychologist opined that these results are "consistent with the characteristics of students who have been diagnosed with ADHD" (*Id.*).

The first medical record is dated December 19, 2011, from Ila Shah, M.D. at Cottage Medical Center ("CMC") (R. 192). Dr. Shah noted KH brought in a school report reflecting the school diagnosed KH with ADHD, and stating his behavior was affecting his grades (R. 192-193).[2] Dr. Shah diagnosed KH with ADHD and prescribed him Ritalin 10 milligrams ("mg") in the morning (R. 192).

On December 20, 2011, representatives from Langston Hughes Elementary School ("LHES") where KH was attending first grade met with Ms. Jones to discuss a Behavior Functioning Analysis ("BFA") and Behavior Intervention Plan ("BIP") (R. 197-203). The BFA began with general observations and baseline data describing with examples that KH did not listen to or follow instructions that were given and was often disruptive to himself and other students in the classroom (R. 199). It further described how KH had participated in bullying and fighting with other students (*Id.*). The BFA then detailed the triggers for those behaviors, intervention attempts and consequences, expected behavior changes, and planned non-restrictive and restrictive interventions (R. 199-201). The BIP described the plan to help change and intervene when such conduct arises (R. 202-203).

The BFA also noted certain behavioral strengths, stating KH "is a very charming little boy when he wants to be" and knows the difference between right and wrong and is able to self-correct (R. 199). It further stated that KH is "very sociable" and that "for the most part gets along with everyone and is well liked by the other students" (*Id.*). KH "can be considered a leader" and his classmates look up to him and follow his lead at times (*Id.*). The behavior strengths section

---

[2] It is not clear from the record whether Dr. Shah was given a copy of Ms. Scotti's Report of Behavioral Checklist or some other school document.

3

concluded by noting that with one on one attention, KH is "focused and attentive and is able to complete assignments" (*Id.*).

Melissa Jones applied for SSI on KH's behalf on January 20, 2012. KH returned to see Dr. Shah on February 3, 2012. The progress notes list complaints of behavior problems (R. 189). Dr. Shah again diagnosed KH with ADHD, prescribed Ritalin 15 mg, and advised that he receive psychotherapy (*Id*). On March 20, 2012, while a first grader at LHES, Ms. Duncan, KH's school case manager, filled out a request for administrative information for the Disability Determination Services ("DDS") (R. 195-196). Ms. Duncan noted that no recent evaluation on KH had been performed and wrote that "[a]t this time [KH] is not being referred for testing" (*Id.*). She stated that the school had put a behavior plan in place for KH, and attached the plan (R. 196-203). Ms. Duncan reported that KH had repeated first grade and was in regular education classes with no special instruction (R. 195). There is no information in the record explaining why KH repeated first grade.

On April 9, 2012, Rosetta Oyeneyin, KH's first grade teacher, completed a teacher questionnaire for the DDS stating she had known KH since September 2011 and saw him for about five hours a day for math, science, social studies, and art (R. 210-217). Ms Oyeneyin noted KH's "actual" grade level was first grade and that he was not receiving any special services, but opined that his "current instructional level" was "below level" in reading and math (R. 210). The form asked for a comparison of KH's functioning to that of a same aged child who does not have impairments in the following domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself (R. 211-216). Ms. Oyeneyin concluded KH had no problems moving

about and manipulating objects, and the physical well-being domains (R. 214, 216).[3] Evaluating KH's proficiency in acquiring and using information, Ms. Oyeneyin checked that KH had a serious problem in three of ten categories -- reading and comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions -- but she did not provide any written details (R. 211).[4]

In evaluating proficiency in attending and completing tasks, Ms. Oyeneyin determined KH had serious problems in five out of thirteen categories.[5] He rarely finished class assignments due to his inability to read simple words, but he had no trouble with math because KH enjoyed computation and "he usually doesn't have to read it" (R. 212). Considering the interacting and relating with others domain, Ms. Oyeneyin marked that KH had serious problems in seven of thirteen categories (R. 213).[6] Ms. Oyeneyin advised that KH had been written up for behavioral problems several times since kindergarten (*Id.*). Assessing the "caring for himself" domain, Ms.

---

[3] In the health and physical well being section, Ms. Oyeneyin reported that she did not know if KH was prescribed or taking medication (R. 216).

[4] The rating scale on the form was from 1 to 5. Level 1 signified "no problem," level 4 signified a "serious problem" and level 5 signified "a very serious problem" (R. 211-215). For purposes of this opinion, the Court is considering ratings in level 4 and 5 when it notes a "serious problem" in a domain. In the acquiring and using information domain Ms. Oyeneyin also found KH had: obvious problems learning new material, and recalling and applying previously learned material; slight problems with comprehending and doing math problems, and providing organized oral explanations and adequate descriptions; and no problems comprehending oral instructions and understanding, and participating in class discussions (R. 211).

[5] Ms. Oyeneyin found KH had: serious problems changing from one activity to another without being disruptive, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at reasonable pace/finishing on time; obvious problems paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, waiting to take turns, and organizing own things or school materials; a slight problem with sustaining attention during play/sports activities; and no problem carrying out single-step instructions (R. 212).

[6] Ms. Oyeneyin found KH had: serious problems seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules (classroom, games sports), respecting/obeying adults in authority, using language appropriate to the situation and listener, and introducing and maintaining relevant and appropriate topics of conversation; obvious problems playing cooperatively with other children, making and keeping friends, and taking turns in a conversation; a slight problem with interpreting meaning of facial expression, body language, hints, and sarcasm; and, no problem with relating experiences and telling stories, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (R. 213).

Oyeneyin rated KH with serious problems in four out of ten categories (R. 215).[7] Ms. Oyeneyin opined that KH's biggest problem was handling his emotional moods; noting that when upset, he sometimes called teachers names, cursed, and hit or pushed other students (*Id.*).

On April 19, 2012, Kenneth Levitan, M.D., performed a psychiatric consultative examination of KH on behalf of the DDS (R. 225-227). KH was 6 years old and in the first grade - - general education classes - - at that time (R. 225). Dr. Levitan interviewed KH with his mother present, and asked Ms. Jones for background information. Ms. Jones reported that KH had never been seen by a psychiatrist or counselor for outpatient therapy, but had been seeing a counselor at school for his behavioral problems since November 2011 (*Id.*). Ms. Jones reported KH was taking Ritalin 10 mg in the morning for the past three months which she said was helpful, but he had not taken his dose the morning of the exam with Dr. Levitan (*Id.*).[8] She stated that KH gets along with adults, but not with other children (R. 226).

Dr. Levitan noted that during the examination KH spoke softly and was "reserved, controlled, and matter-of-fact at first, but he became increasingly more animated in a restless and hyperactive way" (R. 225). KH "was constantly moving around as he sat, sometimes slapping himself in the face and sometimes bouncing his head against the [couch] cushions" (R. 226). KH touched the wall above Dr. Levitan's couch as he sat and also frequently sat on the floor rather than on the couch (*Id.*). KH responded, however, to Dr. Levitan setting verbal limitations on how

---

[7] Ms. Oyeneyin found KH had: serious problems handling frustration appropriately, identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood (e.g., calming self), and using appropriate coping skills to meet daily demands of school environment; obvious problems being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, and knowing when to ask for help; and no problems taking care of personal hygiene and caring for physical needs (e.g., dressing, eating) (R. 215).

[8] The Court notes that while KH's mother reported to Dr. Levitan on April 19, 2012, that KH was taking 10 mg of Ritalin a morning for the past three months, Dr. Levitan noted in his report that he had the medical progress notes from KH's February 3, 2012 doctor's visit during which Dr. Shah increased KH's Ritalin prescription to 15 mg (R. 189, 225-226). This discrepancy is not addressed in Dr. Levitan's report and it is unclear what dosage KH was actually taking in April 2012.

to act. During the mental status examination, Dr. Levitan reported that he found no looseness of association or flight of ideas in KH's thought process, and that he had difficulty concentrating (R. 227). Dr. Levitan found KH was oriented to person, but not to place or time, and did not respond when asked what city he was in or know the date (*Id.*). Dr. Levitan opined KH's "judgment seemed questionable at times for his age," and he "appeared to have an about average to somewhat below average intelligence for his age" (*Id.*). Dr. Levitan diagnosed KH with ADHD "with behavioral problems" (*Id.*). He opined KH could perform simple and routine tasks, but would often require adult supervision in order to do so (*Id.*). He further stated that KH was currently having difficulty handling school pressure and stress, but he could communicate with peers and teachers (*Id.*). Dr. Levitan found that KH could follow and understand instructions, but could not be relied upon to retain them (*Id.*).

There are eleven pages of behavior incident forms from LHES documenting 13 school rule infraction incidents between March and May 2012 (R. 244-252). These incidents ranged from shouting and cursing at a teacher, to walking on top of a desk, to hitting and slapping another student in the face (*Id.*). On two of the occasions, KH was suspended from school for two and three days, respectively (R. 248, 251).

On May 24, 2012, based on reports from LHES received on March 25 and April 11, 2012, Cottage Medical Center reports received on March 7, 2012 and Dr. Levitan's report, non-examining consultant Marva Dawkins, Ph.D., completed a childhood disability evaluation on KH on behalf of the DDS (R. 230-235). Dr. Dawkins opined that KH had a severe impairment of ADHD with behavior problems, but that his impairment did not meet, medically equal, or functionally equal the Listings (R. 230). In particular, Dr. Dawkins assessed KH with: (1) marked limitation with respect to interacting and relating with others; (2) less than marked

7

limitations with respect to acquiring and using information, attending and completing tasks, and caring for himself; and, (3) no limitations with respect to moving about and manipulating objects, and his health and physical well-being (232-233). Under attending and completing tasks, Dr. Dawkins noted that KH's teacher indicated problems finishing work in class mostly due to problems reading, but that KH does not have problems with math (R. 232). Thomas Low, Ph.D., was asked to fill out a childhood disability evaluation on reconsideration (R. 236-241). Dr. Low reported that KH alleged on reconsideration that his behavior was worse both at home and at school but that a determination could not be made because of a failure to cooperate and insufficient information (R. 241).

KH saw Dr. Shah on September 4, 2012 for what was written on the progress notes as "behavior problems" (R. 318). Dr. Shah diagnosed ADHD and maintained the Ritalin dosage at 15mg (R. 318). KH returned to Dr. Shah on January 25, 2013 and his dosage of methylphenidate (the generic form of Ritalin) was decreased to 10 mg (R. 319). On January 30, 2013, Ms. Jones sought outpatient services for KH at Ada S. McKinley Community Services, Inc. ("ASMCS") (R. 263). KH was diagnosed with ADHD and was assigned a Global Assessment of Functioning ("GAF") score of 50 (R. 259).[9]

KH saw Dr. Shah on March 26, 2013 complaining of cold symptoms and ADHD (R. 324). Dr. Shah continued KH's prescription a daily dose of methylphenidate at 10mg at 8:00 a.m. (R. 324). KH returned to Dr. Shah for ongoing treatment for ADHD on May 31, 2013 at

---

[9]"The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) *citing, Am. Psychiatric Ass'n, Diagnostics and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000). "A GAF between 41 and 50 indicates 'Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011). In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity ... and questionable psychometrics in routine practice.'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) *quoting*, DSM 16 (5th ed. 2013).

which time Dr. Shah increased the prescribed dosage of methylphenidate to 15 mg at 8:00 a.m. and 5 mg at 1:00 p.m. (R. 325).[10] On June 13, 2013, Keyuana Muhammad, an ASMCS Qualified Mental Health Practitioner ("QMHP"), met with KH and his mother to determine a treatment plan (R. 259). Ms. Muhammad filled out a twenty-six page Mental Health Assessment2 form (R. 268-293). KH was assigned a GAF score of 47 at that time (R. 290). Ms. Muhammad determined that KH should participate in case management, client centered consultation, community support, individual therapy and family therapy (R. 293). On August 5, 2013, ASMCS QMHP Danielle Garner-Tillman met with KH and his mother for medication training to discuss the proper administration, use and storage of KH's prescribed medications (R. 266). Ms. Garner-Tillman recorded that KH was prescribed Ritalin, 5 mg 3 tabs in the morning, Ritalin 5 mg 1 tab at 1:00 p.m., and Risperidone 0.25 mg at night (*Id.*).

There are no school records from KH's year in second grade during the academic year 2012-2013.[11] KH received a third quarter, 2013-2014 School Year Progress Report/Failure Notice ("Report/Notice") from Dunne Technology Academy where he was attending third grade (R. 328-329). It is unclear from the record when and why KH changed schools from LHES to Dunne Technology Academy. The Report/Notice reflects that as of the end of third quarter of third grade, KH had an "F" in reading, writing and mathematics, a "B" in science, and an "A" in physical education (R. 328). The Report/Notice advised that a separate failure notification would be sent if there was no improvement in the "core areas" (*Id.*).

On March 3, 2014, a team of teachers and administrators from Dunne Technology Academy had an Individual Education Program ("IEP") conference with Ms. Jones and

---

[10] There is no explanation in the medical visit progress notes why the dosage was increased.

[11] It appears that during the academic year 2011-2012, KH repeated first grade (R. 195).

9

discussed a Functional Behavior Assessment (R. 333-355). The third grade IEP plan noted that KH completed the Winter 2014 MAP Assessment and scored "low in all areas" of mathematics and reading (R. 335). While noting that KH was improving his ability to spell unfamiliar words through participation in a "high frequency words remediation program" and the use of spelling rules, the IEP states that he continued to require "significant assistance" in completing reading assignments (*Id.*). Addressing academic achievements, the IEP stated "[a]cademically, [KH is] not able to read" and attended the first grade class to work on Phonics for his reading (R. 344). It also states that KH did not complete classroom or homework assignments (*Id.*).

**B.**

At the March 20, 2014 hearing before the ALJ, KH and his mother testified. Ms. James testified first, and began by explaining that her son takes Methylphenidate, the generic form of Ritalin, and has taken that medication since he was diagnosed with ADHD (R. 63). She testified that KH goes to see his doctor every month. Ms. James stated KH does not receive any other counseling or therapy (*Id.*). She explained that KH was not set up with a counselor yet, but when he goes for his next appointment with his doctor they will see about a counselor (*Id.*). She reported that KH had two suspensions last year and has had quite a few detentions this year in third grade (R. 64-65).

KH testified next. He stated that he was eight years old and in the third grade (R. 65). He testified he was doing "fine" in school, but did not get good grades (*Id.*). He testified that some days he had problems in school, explaining he had problems listening to teachers and did not do his work (R. 65-66). He testified that he did not get into fights with other kids, but then admitted that he had hit people (R. 66). He also admitted that he pulled down his pants and urinated under his desk because he had to go to the bathroom badly and the teacher would not let him go (*Id.*).

10

He stated he did not take his medicine every day, explaining he sometimes forgot to take it but would then take it at 1:00 p.m. at school (*Id.*).

### C.

On June 3, 2015, the ALJ issued an 18-page, single-spaced written opinion finding KH was not disabled pursuant to section 1614(a)(3)(C) of the Social Security Act (R. 18-35). "The Secretary's test for determining whether a *child* claimant is disabled is an abbreviated version of the adult test." *Sullivan v. Zebley*, 493 U.S. 521, 526 (1990) (*emphasis in original*). Within the meaning of the Social Security Act, a child (meaning an individual under the age of 18) is disabled if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Giles*, 483 F.3d at 486–87. At Step 1, the ALJ must determine whether the claimant has engaged in substantial gainful activity. *Id.* If he has not engaged in substantial gainful activity, then the ALJ determines at Step 2 whether the claimant has a severe impairment or combination of impairments. *Id.* If so, then the ALJ proceeds in Step 3 to determine whether the claimant has an impairment(s) that meets, or is medically or functionally equivalent to, one of the listings of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Whether a claimant's impairment

equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Id.* at 670.

In determining whether an impairment is the functional equivalent of a Listing, the ALJ "analyzes the severity of the impairment in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009); 20 C.F.R. § 416.926a(b)(1). "To functionally equal the listings, the ALJ must find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Hopgood*, 578 F.3d at 699; 20 C.F.R. § 416.926a(a). "A 'marked' limitation exists when the impairment seriously interferes with the child's 'ability to independently initiate, sustain, or complete activities.'" *Hopgood*, 578 F.3d at 699, *quoting* 20 C.F.R. § 416.926a(e)(2)(i). A child under the age of 18 has a "marked" limitation when he has "a valid score that is two standard deviations or more below the mean ... on a comprehensive standardized test ..." 20 C.F.R. § 416.926a(e)(2)(iii).

In this case, at Step 1, the ALJ found that KH was a preschooler on the date of the application and a school aged child at the time of the hearing, who has not engaged in substantial gainful activity since January 20, 2012 (R. 21). At Step 2, the ALJ found that KH has the following severe impairment: ADHD (*Id.*). At Step 3, the ALJ found that KH does not have an impairment or combination of impairments that meets or medically equals, or is the functional equivalent of the listing, Section 112.11 (ADHD) (R. 21-35). More specifically, the ALJ found KH's impairment did not medically equal the severity of Listing 112.11 for ADHD (R. 21-22). The ALJ further found that KH's impairment was not the functional equivalent of the listing reasoning he has marked limitation in interacting and relating with others, but has less than

marked limitations in the other five domains including acquiring and using information (R. 28-35). Accordingly, the ALJ found KH was not disabled (R. 35).

### III.

"We review the ALJ's decision deferentially only to determine if it is supported by 'substantial evidence.'" *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id. (internal citations and quotations omitted)*. "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

It is well settled that, while "a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors [her] ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) *(citations omitted)*. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Plaintiff challenges the ALJ's decision on numerous grounds, asserting: (1) the ALJ ignored substantial evidence of a disability and only discussed part of the record; (2) the ALJ failed to give the appropriate weight to (or improperly ignored) the opinions of the treating and examining physicians, teachers and mental health practitioners, and failed to articulate her reasons for doing so; (3) the ALJ failed to consider plaintiff's emotional and mental impairments when determining his functioning in the area of caring for himself; (4) the ALJ substituted her

own opinion for the findings of the QMHPs, rejecting substantial evidence that KH has a marked impairment in the areas of cognitive/communicative functioning and maintaining concentration persistence and pace; and, (5) Plaintiff meets or equals the listing of impairments at Section 112.11 (doc. # 14-1, Pl.'s Mem. in Supp. Mot. Sum. J. ("Pl.'s Mem") at 5-15). The Commissioner counters, asserting that: (1) the ALJ reasonably found that KH did not meet the criteria for Listing 112.11; (2) substantial evidence supports the ALJ's finding that Plaintiff's impairments do not functionally equal a listed impairment; and, (3) the ALJ adequately developed and assessed the record (doc. # 16, Def.'s Mem. in Supp. Mot. Sum. J. ("Def.'s Mem.") at 3-13).

We find that a remand is required because the ALJ failed to address significant evidence of record in finding that KH has a less than marked limitation in acquiring and using information. Because we find a remand appropriate on this ground, we need not address Plaintiff's remaining arguments raised in support of summary judgment. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) ("These flaws are enough to require us to remand ... [and] [w]e therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding ... were so 'patently wrong' as to separately require remand.").

IV.

The regulations state that in addressing the acquiring and using information domain, the ALJ considers how well the child acquires or learns information, and how well the child uses the information he has learned. 20 C.F.R. § 416.926a(g). Addressing different age groups, the regulations note that for preschool children, ages three to six, the child "should begin to learn and use the skills that will help [him] to read and write and do arithmetic" when he is older. 20 C.F.R. § 416.926a(g)(2)(iii). For school-age children, ages six through twelve, the child "should

14

be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). As Social Security Ruling ("SSR") 09-3p makes clear "[b]ecause much of a preschool or school-age child's learning takes place in a school setting, ... school records are often a significant source of information about limitations in the domain of 'Acquiring and using information'" and poor grades are an "obvious indicator[] of a limitation in this domain...." SSR 09-3P, 2009 WL 396025, at *3.

In support of her finding, the ALJ relied on KH's mother's function report filed in February 2012, when KH was in first grade, in which she reported that KH can print "some letters," can print his name, can add and subtract numbers over 10, and knew the days of the week and months of a year (R. 29, 149). The ALJ did not set forth that on this same page Ms. Jones also reported that KH *cannot*, amongst other things, read capital letters of the alphabet, read capital letters and small letters, read simple words, read and understand simple sentences, spell most three and four letter words, or tell time (R. 149).

The ALJ also cited and relied upon the following evidence from professionals, including medical practitioners and teachers, to support her conclusion that KH has a less than marked limitation in acquiring and using information: (1) in April 2012 the consultative examiner opined that KH had average to below average intelligence for his age but in January 2013, an evaluating clinician concluded that he was of average intelligence;[12] (2) KH's first grade teacher stated that KH had no problem comprehending oral instructions or understanding and participating in class discussions, had only slight problems comprehending and doing math problems and understanding and participating in class discussions, and had greater limitations expressing ideas

---

[12]The ALJ cited a Mental Health Assessment2-Intervention Services form filled out by an ASMCS QMHP on June 13, 2013 (R. 268-293). The form provided for a yes or no answer to "Does the client appear to have average intelligence." (R. 282). The QMHP checked "yes" (*Id.*).

in writing, reading and comprehending written material; (3) a June 2013 evaluation record reflecting KH had never been diagnosed with a learning disorder; (4) KH's March 2014 IEP indicating he scored low in math and reading testing, but showed improvement in spelling; and, (5) the non-examining state agency psychologist concluding in May 2012 that KH had less than marked limitation in this domain (R. 29). But, the ALJ failed to note that KH's first grade teacher rated KH as having "a very serious problem" reading and comprehending written material, "a serious problem" expressing ideas in written form and applying problem-solving skills in class discussions, and an "obvious problem" learning new material and recalling and applying previously learned material (R. 211). Nor did the ALJ cite or discuss the extent to which the fact that KH apparently had to repeat first grade, or that he received in 2014 a Dunne Technology Academy Progress Report/Failure Notice in third grade due to his grades in reading, writing and mathematics, affected her finding of less than marked in this domain (R. 195, 328).

Evidence that the ALJ failed to discuss bears directly on whether KH has a less than marked limitation in acquiring and using information. In October 2011, based on the results of the BASC-2 behavior checklist completed by two classroom teachers and Ms. Jones, a school psychologist found KH was ranked "At-Risk and/or Clinically significant" for "Learning Problems (the presence of academic difficulties, particularly in understanding or completing schoolwork)" (R. 206). KH repeated first grade and during his second year in first grade, his teacher opined he was reading and performing math below first grade instruction level and stated he "rarely" finished any class assignment due to his inability to read simple words (R. 212). In 2014, KH was failing Reading, Writing and Mathematics in the third quarter of third grade (R. 328).

16

In her general write-up of the evidence, without citing the year or school grade, the ALJ addressed this exhibit stating "[t]he claimant failed some of his classes," but he got a B in science and an A in physical education (R. 26). An ALJ may not "select and discuss only that evidence that favors h[er] ultimate conclusion," but must instead consider all relevant evidence. *Herron*, 19 F.3d at 333; *see also, Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (the "'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). The ALJ's failure to cite and discuss this evidence precludes the Court from "'evaluating … whether substantial evidence existed to support the ALJ's finding.'" *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) (*internal citations omitted*) ("An ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence."). *See also Scrogham*, 765 F.3d at 698 (ALJ "was inappropriately selective in choosing the evidence on which she based her opinion.").[13]

The Court also notes that the ALJ gave significant weight to the non-examining state agency psychologist's May 2012 opinion that KH had a less than marked limitation in this domain, based in part on the evidence that KH attended regular classes and had no problems with math (R. 232). However, that opinion was reached prior to KH receiving failing marks in reading *and mathematics* in third grade in 2013-2014 (R. 29). *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (ALJ failed to provide sound explanation for rejecting most current treating professional's opinion over older agency opinions: "ALJ would be hard-pressed to justify casting aside [most recent professional opinion of treating medical professional] in favor of these earlier

---

[13] We are left without guidance from the ALJ as to how getting an "A" in physical education translated to evidence that KH was not markedly impaired in acquiring or using information. Moreover, the ALJ failed to explore how KH could achieve a "B" grade in science while failing math, and without being able to read, problem solve, or apply previously learned material.

17

[two years old] state-agency opinions"). In addition, KH's Individualized Education Program ("IEP") from March 2014 under "Academic Needs" stated that KH "continues to require significant assistance in the monitoring and completion of reading assignments" (R. 335). The IEP further documents that having completed the Winter 2014 MAP Assessment, KH scored low in all areas of math and reading (*Id.*).

In these circumstances, we remand the case because "a reasonable person could not accept [the ALJ's] reasoning as adequate to support the decision." *See Murphy v. Astrue*, 496 F.3d 630, 634-65 (7th Cir. 2007) (remanding proceedings finding "ALJ did not explain why he gave no weight to the portions of the school documents which support a finding that [claimant] is disabled").

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for summary judgment (doc. # 14) and denies the Commissioner's motion for summary affirmance (doc. # 15). This case is remanded to the ALJ for further proceedings consistent with this opinion.[14]

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: January 17, 2017

---

[14] We note that a child under the age of 18 will have a "marked" limitation when he has "a valid score that is two standard deviations or more below the mean ... on a comprehensive standardized test ..." 20 C.F.R. § 416.926a(e)(2)(iii). While agency regulations did not compel her to do so, the ALJ could have either re-contacted Dr. Dawkins for an updated opinion or ordered another state agency medical source opinion in light of the 2013-2014 Progress Report/Failure Notice. We strongly suggest the ALJ do so on remand.

18